Mr. McGuire. Yes, Your Honors. Good afternoon. Kenneth McGuire for Ronald Brown. May it be a pleasure to be with you today. Thank you, Mr. McGuire. My name is Kenneth McGuire. I'm the attorney at the District Court and opposing counsel. Your Honors, this case is primarily about whether the District Court erred when ruling on our Weatherford-Black-Hoffa-Morrison motion by applying a purely standard based on the attorney-client privilege versus what Weatherford established, I think fairly clearly, in which we argued, which is that the Sixth Amendment right to the assistance of counsel is broader than the attorney-client privilege, which is not constitutionally based, but is just a rule of evidence. We argued that the holding in Weatherford, which states that if a person invites a third party who turns out to be an informant into attorney-client communications, but does so on the basis of a belief that that person is a confederate and ally, which is the language from Weatherford, that that does not waive the Sixth Amendment right that Weatherford and Black and Hoffa and Morrison established. The Court denied our motion under Weatherford and under Black on that basis, that inviting a third party thought to be a confederate and ally turned out to be an informant. What would be the basis to think that the third party was an ally? If the lady turned out to be an informant, I'd approach our client asking for an investment in her business. Was the lady an informant during the August 4th meeting? At that time, she was not. What would be the basis for thinking that that person was an ally? Well, because they were contemplating a business venture together and the informant, I'd approach my client about that and ask for an investment in her school. My client then said, well, let's go to my lawyer's office. He had a different idea perhaps than she did of how to fund that investment, but that was the basis of going to the attorney's office and having this conversation. During those conversations at the attorney's office, at no point did Ms. Diaz, the informant, say to my client, you know what, I don't want to do this anymore. I'm not interested. I don't want to proceed any further with this. She could have done that. She chose not to. In fact, she did set up additional meetings with the attorneys and, in fact, did sign a retainer agreement with one of the attorneys present during the first meeting, which was not recorded, but where Ms. Diaz did provide information from that meeting immediately the next day to an FBI agent, Ms. Dunlap. Does the record reflect whether your client personally invited Ms. Diaz to either the August 4th or September 17th meeting? I'm sorry, did the . . . Did Mr. Brown personally invite Ms. Diaz to the August 4th or September 17th meeting? He did, because there would have been no way for Ms. Diaz to know where to go, which because it was Mr. Brown's lawyer's office. I'm sorry? He did because there would have been no way for Ms. Diaz to know where to go to Mr. Brown's attorney's office. She had no relationship with his attorney, Mr. Chip Lewis. That original meeting was not recorded, but nonetheless, Ms. Diaz provided information from that meeting to agents the next day. I believe, Your Honors, that the Black and Weatherford are the key cases here. The Black, in particular, I think is most factually applicable because the Black case involved an intrusion into attorney-client communications that was before Mr. Black was charged, and yet the Supreme Court in that case held that the Sixth Amendment right was Mr. Black was entitled to a new trial and a chance to prove that any information derived from the intrusion into the attorney-client communications was used directly or indirectly to either prejudice Mr. Black or to assist the government. That's what we asked for here, was a hearing where we could tease out, as Weatherford mentions, whether or not there were direct or indirect benefits, either injuring Mr. Brown or whether they benefited the government. We pointed out in our briefing that there were numerous instances where information derived from the initial August attorney-client meeting was transmitted to the government the next day and then used by them to develop witnesses that did come and testify against Mr. Brown in this trial. Even Justice Harlan, who dissented in the Black v. United States opinion, he dissented because the Supreme Court reversed Mr. Black's conviction instead of what Justice Harlan in his dissent said they should have done, which is remand for an evidentiary hearing where Mr. Black could then attempt to prove that the government benefited in some way. The facts that the Court recalls from the Black case were there was a tax prosecution where Mr. Black was in a hotel room with his lawyer. The hotel room had been bugged by the FBI before Mr. Black was ever charged and attorney-client communications were overheard. That information ultimately was transcribed, put in a memorandum, and transmitted to Department of Justice attorneys who later, I believe over a year later, but a substantial period of time later, prosecuted Mr. Black. Even though those Justice Department attorneys stated that they obtained no benefit and did not rely on any information derived from those attorney-client communications, the Supreme Court said Mr. Black was still entitled to an evidentiary hearing to establish any evidence that was derived from the intrusion and to be suppressed, which is what we asked for here. We were denied. It was that evidentiary hearing. The government brings up a point and cites a number of the Supreme Court's cases, citing the Supreme Court's case decision in Rothgary about the Sixth Amendment right and when that right accrues. Rothgary held that it was a case about the right to appointment of counsel and held that the right to appointment of counsel begins once adversary proceedings are commenced. The opposing counsel argued that. Therefore, because Mr. Rothgary was a Brown and had not been indicted at the time of the intrusion to happen in this case, that he has no Sixth Amendment right. The problem with that analysis is that Rothgary did not distinguish or overturn or even discuss the line of case law that includes Weatherford, Morrison, Black, and Hoffa about intrusions into attorney-client communications. It's in a different context and the Supreme Court has repeatedly cautioned that it is, quote, this Court's prerogative alone to overrule one of its precedents. It did so as recently as 2016 in the Bossie v. Oklahoma case, 137, Supreme Court 1, and has long done it and Rodriguez v. Shearson American Express 490 U.S. 47744. So the Supreme Court has never overturned Weatherford or Morrison or Black and those cases are still valid and the most relevant case on point again is the Black decision because Black, the intrusion happened before Mr. Black was ever charged, which is what happened here in this case. What we're asking for in this case is a reversal of the convictions and a chance to have an evidentiary hearing to try to show direct and indirect derived benefits that the government received from the intrusion into the attorney-client communications that occurred here. As the Court is aware from the briefing, there were multiple intrusions and several of them were done where the government had the informant wired as she went into and participated in these attorney-client communications. All of that was done before the government obtained any kind of an order for crime from exception, which was obtained in this case after the intrusions occurred and from a magistrate. Those, that finding violated the rule of the United States v. Zollin which requires that before government agents can intrude into attorney-client communications, they have to get a warrant from the court and they're limited in what information they can use to try to get that warrant. They can't use breaches of attorney-client communications in order to get a warrant to breach further attorney-client communications. That's probably the reason why the district court in this case made no crime-fraud finding in its order and because of the problem with dealing with the fact that Zollin was not complied with. So the court, the district court in this case based its decision solely upon applying this attorney-client standards, excuse me, attorney-client privilege standards of this court, but did not address the holding in Zollin that you do not lose your Sixth Amendment, excuse me, the holding in Weatherford that you do not lose your Sixth Amendment right to be free from government intrusions into attorney-client communications just because you invite a third party, thought to be a confederate, an ally into meetings with your attorney and . . . Mr. Breyer, can I suggest that you cover your double jeopardy? I see you're running out of time. Do you have a double jeopardy? Yes, Your Honor. The double jeopardy, the case that was recently decided by the Supreme Court, the name escapes me, but it's in the briefing where the Supreme Court held that 924J, use of a firearm resulting in death, was clearly intended by Congress not to impose a second punishment and therefore that directly implicates the Blockburger double jeopardy rule because the 924J is the greater included offense that incorporates the double jeopardy the drug trafficking crime for count one or the crime of violence for count two. So count three and four, which are the 924J counts, are the greater included because they necessarily incorporate count one and count two. And we moved to strike count one, strike counts one and two, the lesser included under the Blockburger test. We did that adequately in front of the court. The court denied it. Even if this panel agreed with you, what would be your remedy? For that, it would be to strike counts one and two, Your Honor, and not three and four and send it back for resentencing. And counts three and four had a sentencing range of zero to life, whereas counts one and two had a mandatory life imprisonment sentence. So that's why the parties did not present any sentencing arguments at sentencing, either the government or the defense, because the mandatory life sentence after the court ruled the way it did was obligatory, certainly on counts one and two. Are you asking us to send it back for resentencing just on counts one and two and three and four or all sentences on all counts? It probably would make sense to do it on all remaining counts, because I believe counts one and two need to be dismissed, because the government was dismissing on the basis of double jeopardy. They moved to dismiss three and four. We asked for dismissal of one and two. That wouldn't necessarily require resentencing on three and four. And if we went on requesting a new trial in a suppression hearing under Weatherford, that obviously would vacate all the sentences that, and judgments, excuse me, all the sentences that were imposed in the case. I'm not sure I understand your response with regard to your second issue. Yes. Should there be a resentencing, if we were to agree with you, and if we sent it back in the manner that you described and the district court was to resentence on counts three and four, would we also remand for resentencing on five and six? Would those be impacted at all by the remand for resentencing on three and four? I don't believe so, Your Honor, because I don't believe those had life sentences, and they were statutorily capped. So I don't believe they would be affected, the other counts. I believe one was a kidnapping count, if I remember correctly. I think it had a 20-year maximum, and that would not need to be resentenced. Thank you. Yes, Your Honor. See you on Roboto. May it please the Court. Amy Alaniz for the United States. I'd like to talk briefly about the facts underlying Issue 1. Basically, back in July of 2003, Houston HSI gets a tip that Brown's two truck drivers are involved in a criminal organization, so they start surveilling them. They are in the parking lot on October the 4th. You're aware that they work for a shipping company out of Pasadena, Texas. They surveilled, and they saw Mr. Hughes take a big bag out of the truck that he and the other guy were driving and put it in his car and take off down I-10. They do a traffic stop on him, and they find the bag is full of well over $700,000 in cash. And so this is what spurs Mr. Brown to seek legal advice. He calls this confidential informant, who is a lady that he had been talking to previously. She was building a school, and she was looking for investors, and somebody told her, well, ask him. He might have some money to invest. So she had spoken to him several times about this school project. So he calls her up on a Sunday. This is the day after the big cash seizure, and he says, will you meet me at my attorney's office? And she says, sure. She's thinking they're going to talk about the investment. When she gets there, they don't talk about that at all. They talk about Mr. Brown's fraudulent plan to have her petition to get that money back and say that it's her money and that it's legal proceeds, not drug proceeds. And that is what they talk about that day. The truck driver calls in, and he talks about what happened, but that's all they talk about. They do not talk about his criminal history. They do not talk about his future criminal plans. They simply talk about his plan to fraudulently recover his drug proceeds using this lady. And so she is so shocked and upset and scared, the next day calls an FBI agent that she knew. And this eventually leads, but this doesn't happen until, like, September. She eventually gets the okay to wear a recording device to some of her discussions. So she and Mr. Brown have several discussions totally outside of the presence of any attorneys, and he brags about his drug trafficking. He tries to get her to invest her money into his drug business. And he needs the money. He's already, like, you know, he's in the hole. He owes his suppliers. He needs money. So there is only one governmental intrusion into the attorney-client relationship here, and that was the meeting on September the 17th that was attended by the confidential informant, Mr. Brown, and the two attorneys that he wanted to file this petition for him. So you're contending that there were no attorney-client conversations at the August 4th meeting? At the August the 4th meeting, there was, but there was no governmental intrusion whatsoever. She didn't even know what the meeting was going to be about. So it's September 17th. This is all they talk about again. They talk about this plan. There's no other information. They just kind of elaborate on, well, how do we do this? How do we explain how you know the truck driver? She didn't know him at all. You know, they discussed the plan. That's all they discussed. They discussed the same thing they discussed August 4th. And so, you know, regardless of whether we apply the Weatherford factors, which, you know, Weatherford is based on the Sixth Amendment right to counsel, which does not attach until the prosecution commences, whenever that is. Sometimes it's the grand jury. Sometimes it's arrest. It can be different things, but none of that had happened here. The thing that got him, that led to his downfall didn't even happen until the next year. And it wasn't a federal case until, I think, 2017. So the Sixth Amendment right to effective assistance of counsel is not in play here. But if you look at attorney, just plain old attorney-client privilege, the test is in Morrison, which says that even if there is a deliberate government intrusion into the attorney-client relationship, you don't get automatic relief. You have to show prejudice. And there really is none here. There wasn't anything discussed in that meeting that the guy had not already learned at the first meeting with the attorneys. And it's simply untrue, you know, any notion that somehow anything discussed in that meeting led to his prosecution later on. The thing that triggered this prosecution was his kidnapping and attempted murder of Eric Williams in April of 2014 after Mr. Brown figured out that Williams, Eric was his cocaine. And so he tries and fails to kidnap and kill Eric Williams. He gets away and immediately becomes a state case because of state kidnapping case. And Eric Williams tells the police everything. He tells them everyone who's involved. He identifies them in pictures. So, you know, Mr. Brown is already certainly, you know, under the microscope by then. But this doesn't deter him. He decamps to Atlanta, but he hires Clyde Williams to murder Mr. Shelestine. That happens July the 1st. Brown finds out from a corrupt parole officer that Mr. Shelestine will be there at his parole visit on January the 1st. And the hitman is waiting. And, you know, he dies in that parking lot. And with that case, again, it was HPD who was the initial investigator. It went cold. And they didn't know. They couldn't really develop who was really behind this. And it wasn't until sometime around late 2015 or 16, they realized that the gun used in that, in the murder was connected, was also used in another, it was like a bank robbery that FBI was investigating. So this is when FBI gets involved. And pretty, they turn it all over to this analyst. And her testimony is really interesting. It's at 2783 to 2815 in the record. And she talks about how she develops, she figures out who were Shelestine's associates. And she looks at them and they go back and they talk to them and they, she gets their phone records and their vehicle records and their travel records and she figures it out. And, of course, once they get to Eric Williams, he tells the feds, yes, it was Brown. I know, you know, Marcus Shelestine and I ripped off his cocaine. You know, I know it was Brown who killed him. So nothing that happened in that September the 17th meeting led to anything in this case. They did, the CI did testify at trial because that was an element of at least two counts. We had to show that this murder occurred in the course of drug trafficking. And we also had the count seven conspiracy, drug trafficking conspiracy, that we charged him with. That went well back. It went back to 2013. So I . . . I have a couple of questions about the district court's dismissal of counts three and four. What's your strongest argument that Brown failed to preserve his appeal regarding that dismissal? Well, he tried to get, we battled count one and two. His initial argument and there was pleading and there was a, you know, Judge Lake wrote a great order, but he claimed that count one and two were, you know, we couldn't convict him on both for double jeopardy reasons. And so in the, leading up to sentencing, the prosecutor realized, wait a minute, we have a problem on counts three and four. They are 924J counts. A few months prior, we had had the case called Laura out of the Supreme Court and it wasn't directly on point about double jeopardy, but what it held was that the mandatory consecutive sentence language of 924C did not apply to 924J. We always thought that it did. And of course, that's the underpinning of a double jeopardy argument because if that language applies to 924C, we know that Congress intended separate punishments for this crime. And so we realized, well, we've got a problem on counts three and four. So the prosecutor moved to dismiss those. The court, you know, he explained, he explained everything in his motion about Laura and why we, you know, probably would have a double jeopardy issue on appeal. And so they were dismissed before sentencing. And at sentencing— Were they dismissed with or without prejudice? I'm sorry, Your Honor? Were they dismissed with or without prejudice? I do not know. Probably with. I mean, I'd assume with, but I do not know the answer to that. But at any rate, and then at sentencing, they're getting ready to sentence Mr. Brown and then his defense counsel gets up and first makes a motion for a continuance. And the judge says, no. And so then he says, well, I want to orally amend my prior double jeopardy motion, you know, on counts one and two to add counts three and four. And Judge Lake said, you know, no, you had plenty of time to file all these things. I've spent a lot of time on your issues. You know, I'm not going to allow that. And so that's the most he ever did. He stood up at sentencing and said, I want to enlarge my double jeopardy motion to include counts three and four. Let me ask one other thing about this. What evidence in the record reveals that the district court used discretionary authority when it granted your motion to dismiss counts three and four? Well, the motion, it's Rule 48. And he says, you know, the government has shown me a very good cause. I'm sorry? It's a Rule 48? That was in the government's motion to dismiss. And the judge at sentencing, he ruled on it. He said, the government has shown good cause to dismiss these counts. And so that was the basis of this ruling. And doesn't the record show that he was especially deferential to the arguments that were made by the government? I'm sorry? That he was deferential to the arguments that were put forth by the government. And I asked that question sort of as a follow-up to Judge Wieners. And since the sole discretion on that issue was supposed to be left up to the judge. Yes. I mean, that's what Rule 48 is. And Judge Lake explained that, you know, Rule 48 was amended some years ago to basically allow the district judge to have the final say. But is there any evidence in the record that the court used discretionary authority? I think he did, under Rule 48. I think he did, because he knew he had discretion, I guess, to say yes or no. And he said, government, you've made a really good argument. I understand your argument. I understand this new Supreme Court case could possibly, it's going to be problematic on appeal. You made a great argument. So yeah, I think he did use his discretion. And if I can make one more point about the double jeopardy issue, the double jeopardy clause of the Fifth Amendment protects against three things. It protects against successive prosecution on the same offense when there's been a conviction. It prohibits successive prosecution on the same offense when there has been an acquittal. And then there is a third part that is relevant here. You cannot be punished multiply for the same offense. And that is why, that's why the government filed its motion to dismiss. There would have been a double jeopardy violation if he had been sentenced on counts three and four and on counts one and two. And we have, the government has the ability to elect which one it wants. I've cited some case law about that. And I was a little puzzled about some of the arguments about the sentences. Count one, conspiracy to commit murder. The sentence is death or life imprisonment. And this case was decertified as to the death penalty, so death was not on the table. Count two, intentional killing while engaged in drug trafficking. It's 20 years to life or death. And on the count 924Js, it's simply death or life. So he was actually better off being sentenced under count two because he at least theoretically had a chance for a lower sentence. That's not what Judge Lake did. He applied a life sentence on count two as well. But I don't, it's hard to understand what kind of prejudice there could be from dismissing count three and four versus count one and two. He was better off with one and two. Are counts one and two lesser included offenses of the offenses charged in counts three and four? Yes. I think probably after Laura, we don't have any case law exactly on point, but if you extrapolate Laura, then, you know, without that language, without that knowledge that Congress wanted multiple punishments, which is what Laura takes out of 924J. We thought it was the same as 924C. So yeah, it's problematic. It's problematic? To be convicted on all four, yes. After Laura, it would be. Should the court have perhaps dismissed one and two, counts one and two, since those were the lesser included offenses? Well, again, he was better off being convicted under count two because he at least theoretically had the possibility of a lesser sentence. Back to Judge Wiener's question then. Where in the record can we determine that the court considered that and made a decision to go forward with three and four as opposed to considering whether one and two should have been dismissed instead as the lesser included offenses? Well, I don't think the defendant ever made that argument. I mean, he didn't. Was it perhaps because the motion got filed the day of sentencing? Well, it was filed that morning. Sentencing was at 2 o'clock, so it wasn't a total surprise. It was not a total surprise? No. I think the motion was filed sometime that morning, and then the sentencing occurred in the afternoon. I checked the record. I think it started at 2 p.m. It's your position that counsel had sufficient time to research the issues and get ready to respond to a new argument on the morning of sentencing? Well, Judge Lora came out actually even before we went to trial in this case. He had all this time to make his argument. Lora was nothing new. Lora was handed down in June of 2023. Trial was in October of 23. Sentencing was in March of 2024. It was the government who spoke up and said, look, there's a double jeopardy problem. If he is sentenced, that is when the double jeopardy violation occurs. If he is sentenced on all these four counts, we think we have a problem. In the interest of justice, yes, we filed that motion, but Lora was out there for months. He could have made those arguments at any time. If you look at the Mesa case and the other cases I've cited, it's the government who decides. We decide what counts to charge. We decide what counts to proceed on to sentencing. Particularly when the defense hasn't asked for anything different. He wanted count one dismissed. If it's the government's role to determine what counts to proceed on at sentencing, how do you reconcile that with the court's discretion to determine which are the appropriate counts? I think there's Rule 48. We have to run it by the judge, right? I think Rule 48 is what gives them discretion, the district court. Is the extent of the court's discretion in your mind to only say yay or nay to the government's motion? I think if you read the rule, if we show good cause, then it's . . . Judge Lake talks about that and he says, they've shown good cause. I agree. There has been no opposition, no counter-arguments at all from the defense. I think he was well within his discretion. I'm almost out of time here, but I wanted to just briefly mention the Black case. It was a Sixth Amendment right to counsel case. He said all the recordings happened before the prosecution commenced. That's not the case. They started before and they continued up until a week after he was indicted. The court in Weatherford treats Black as a Sixth Amendment right to counsel case. If there are no more questions . . . I have one. I asked Mr. McGuire this. If, hypothetically, if we were to agree with his position on the second issue, do we only remand for sentencing as second? To the counts at issue or . . . Yes. . . . the counts. He hasn't challenged the other two. Let's see. There are four life sentences and then the consecutive one. He hasn't challenged his Count 5 kidnapping conviction. He hasn't challenged his firearms conviction and he has not challenged Count 7, which is the conspiracy to drug traffic. If you do go there, yes, it would only have to do with Counts 1 and 2 and 3 and 4. Thank you. We ask for affirmation. Thank you. Mr. McGuire, you have five minutes on rebuttal. Thank you, Your Honors. The government takes a position that there was no intrusion on the original August 4th meeting, attorney-client meeting with the informant and Mr. Brown's counsel attorneys. We dispute that and we do believe there was an intrusion because the government obtained information from that attorney-client meeting and used it to find was there in fact such a seizure that happened that Ms. . . . the informant says she heard about? Did that actually exist? Did it happen around the time and place that she's saying she heard about this seizure? Ms. Diaz had no personal information about that other than what she heard in that meeting. Do you mind if I redirect you to the second issue? I'm going to redirect you to the second issue. Yes. Counsel on the other side says that there was no prejudice by the dismissal of Counts 3 and 4 as opposed to 1 and 2. How do you respond to that? I don't believe that's correct, Your Honor, because . . . What was the prejudice? Well, Count 1 obviously had a mandatory life sentence and that was imposed. Counts 3 and 4, my reading of the statute is the sentence was ten to life, so the judge could have imposed a sentence as low as ten years. He had statutory authority for both 3 and 4 to do that. So, the ten to life is a lower, the minimum sentence of ten years on Counts 3 and 4, the 924J counts, are lower than the mandatory 20 years to life on Count 2 and the mandatory life on Count 1. So, I do think that Mr. Brown had a chance to argue for a lesser sentence if he was sentenced on Counts 3 and 4, which were the greater included. And I cited in my brief, Your Honor, about this court's case law about whether or not the government has discretion to choose which counts to dismiss. And I went back and argued and laid out in the brief where that rule apparently developed, but that rule is a panel opinion, the Bradsby opinion. It's in page 26 of my reply brief. That's where the, at the discretion of the government rules supposedly first, from what I could find, first developed. But that contravened prior panel opinions of this court, which I point out in my briefing at page 25 and 26. And because the later panel overruled or contravened a prior panel and it was not an en banc opinion, that violates this court's rule of orderliness. And there was no discussion in the Bradsby opinion where that rule of, you know, at the election of the government starts. They just, that panel just overturned prior panel decisions and this court's rule of orderliness, which is still in effect and was in effect back then, requires a panel to disregard any decision and follow the earlier panel decision and not a later panel decision. The only way you can overturn an earlier panel decision when an issue has been decided by a panel of the court is by an en banc opinion or a Supreme Court opinion. So, that's the Fifth Circuit's rule of orderliness, which was not followed, is not, was not followed by the, at the election of the government rule. So, I believe it's not binding on this court because there has not been an intervening en banc opinion by this court overturning prior panel decisions. I also, I believe I raised the fact that once trial has commenced, counts may not be dismissed under, I believe it's Rule 48, over the objection of the defendant once trial has started. And that's in the . . . My pleasure, Your Honor. Thank you. This court will sit in recess until tomorrow at 9 a.m.